## J. B. PEIGHTAL AND WIFE v. COTTON STATES BUILDING COMPANY.

### Decided February 27, 1901.

**1.—Usury in Building and Loan Contract—Parol Evidence.**

Parol evidence of antecedent and contemporaneous acts and declarations of the parties is admissible to show that a contract with a building and loan association, fair upon its face, was in fact only a device to cover usury, although such evidence tends to vary and change the written contract.

**2.—Same—De Minimis Lex Non Curat.**

The taking by a loan association, in each monthly payment to it, of an insignificant amount of interest in advance of the legal rate, is not usury where this was done for the sake of convenience, in getting an even number of cents, and with the intention of deducting the excess from the last paymnt.

**3.—Same—Evidence of Intention.**

Where the motive or intention actuating a party is the subject of inquiry, a witness may testify what his motive or intention was; and the rule applies where the question of usury is involved.

Appeal from Lamar. Tried below before Hon. E. S. Chambers.

*Lightfoot, Denton & Long,* for appellants.

*Moore, Park & Birmingham,* for appellee.

NEILL, ASSOCIATE JUSTICE.—This suit was brought by the appellee, a Texas corporation, against appellants, J. B. and Nettie Peightal, to recover $500 and interest according to the terms of a contract between the parties, the terms of which will be hereinafter stated, together with

$50 attorney's fee, and for foreclosure of an alleged mechanic's lien on a certain house and lot situated in Ennis, Texas.

The appellants, defendants below, plead under oath that the contract declared upon was usurious; that the contract was devised by appellee and the National Building and Loan Association as a scheme to cover usury and exact from them more interest than they were allowed to charge by law, and that under it usury was exacted by appellee from and paid it by appellants; that as an inducement for them to enter into the contract, the appellee held out to them, through its agents and printed circulars, that appellants could borrow $500 at 10 per cent per annum with which to build their home; that in order to procure said loan it was necessary to take ten shares of stock, and that every payment of stock would reduce the principal of the debt each month, and that each monthly payment on stock would reduce the principal that much; that no loan could or would be extended beyond six years, or 72 months, and that at the end of that time the debt would be fully paid; that being induced by said promises and agreements, they entered into said contract, agreeing to pay the sum of $500, and secure it by a lien on their homestead in Ennis, and as a part of the contract of loan subscribe for ten shares of the company's stock, that the issuance of the stock was a mere pretense and device to cover usury; that at the time of its pretended issuance by the association, it immediately required it to be transferred back to the company; that it had never been in appellant's possession, but remained in the custody of the association from the date of issuance to the present time; that appellants did not make or want any investment in such stock, but said contract was made by both parties purely as a loan in order that appellants might borrow $500 to build their homestead, and for no other purpose; that the contract was dated August 25, 1892, but appellants had previously thereto been required to pay and had paid the association thereon $11 on August 5, 1892, and $7.70 on September 5, 1892, and that they had been required by the association to pay, and had paid regularly on the 5th day of each month thereafter, the sum of $7.70 for the period of seven years, that is to say, eighty-four months, making in the aggregate $640.10.

That there was at no time, of such payments, the amount of interest due from appellants as was demanded and paid; that appellee wholly failed and refused to carry out its promises and agreements to apply the payments on stock to reduce the principal of the debt each month, as it had agreed, but continued to demand and require appellants to pay the same amounts of the usurious interest on the last month of said eighty-four months as had been required on the first, and that such interest was largely more than 10 per cent per annum. Appellants denied that they ever made default for three months, or for any other time. That the principal of the debt was fully paid, and that all interest payments on said debt were usurious, and that they were entitled to recover double the amount so paid. They prayed for a cancellation of the contract sued on, and for judgment against appellee for $800.

By a supplimental petition the appellee denied the allegations in appellants' cross-bill, and alleged that the payments made each month were made and appropiated as follows: $4.20 interest and premiums, and $3.50 per month on stock. It also plead limitation of two years upon the penalty claimed by appellants for usury.

By supplimental answer appellants averred that the subscription of stock and loan of the money were one and the same transaction; that the agreement to mature the stock and pay the debt in six years was a material inducement held out to them to take the loan. That the plea of limitation does not apply, because the contract was and is a continuous one, extending from August 5, 1892, to August 5, 1899, inclusive, and that the applications of said payment were made and received in writing each month during such time.

After hearing the evidence the court instructed the jury as follows: "In this case I instruct you to render a verdict for plaintiff. You will calculate the interest on the payments made on the amounts paid, and due on the ten shares of stock, at the rate of 6 per cent per annum, and for forty-two and one-half months, and add that amount to the amount of dues paid on stock, deduct the total thus arrived at from $500, the amount of credits and interest, amounting to $360.40, which deducted from $500 would leave $139.60, and calculate the interest on the amount to this date, that is $139.60, at the rate of 10 per cent from September 5, 1899, and return your verdict for that amount, with foreclosure of lien. You will also return a verdict for reasonable attorney's fees."

In obedience to this charge the jury found a verdict in favor of appellee for $147.86, with foreclosure of lien on the land described in its petition, and also found for plaintiff $25 for attorney's fees. Upon this verdict the judgment appealed from was rendered.

So much of the evidence as is necessary to a consideration of the questions involved in this appeal may be stated as follows: On August 5, 1892, the National Building and Loan Association, the name of which was afterwards changed to "Cotton States Building Company," issued to Nettie Pieghtal, one of the appellants, ten shares of "Class A" stock. In her written application to the association for the stock, Mrs. Peightal stated that she had read its literature and understood the amount of dues required to maintain the shares to be 35 cents per month, on each $50 share, payable on or before 5th day of each month, making a total monthly payment of $7; and she agreed to abide by all the terms and conditions and by-laws of the association, and to comply with all its rules and regulations. On the margin of the application was written in red ink: "Agents are not allowed to make any promise not in conformity to our printed matter."

The by-laws of the association provide that all holders of "Class A" shares shall be entitled to a loan of $50 on each share held by him, such loans to be secured by first lien on real estate. That each loan shall be based on shares in "Class A" equal at maturity to the amount of the loan; that such shares must be six months old, or six monthly installments

must have been paid in advance before an application would be considered. That if any shareholder shall fail or neglect to pay the interest on his loan, or his regular monthly installment, or other fees, for three months, or in any way fail to comply with his contract, the association may compel payment of principal, interest, fines and dues by proceeding to foreclose the lien or other securities, which shall at once become due and payable, and the association may cancel and treat as forfeited the shareholder's stock, whether deposited as collateral security or not, and the payments thereon shall be forfeited to the shareholders. That the certificate, terms, and conditions of shares of the association and its by-laws form the contract with the share-holders; and the application for a loan shall form a part of the contract with the borrower. That no agent who solicits shares for the association shall have the right to promise a loan at any time, or to sell shares with the understanding that a loan will be made until it has been first approved by the directors of the home office. Nor shall he have authority to change or alter any of the terms or conditions contained in its literature.

The prospectus, under the title "Homes Make Happiness," issued by the association and read and considered by appellants before applying for shares and a loan from the company, contains the following: "The object of the National Building and Loan Association is to assist its members, either to obtain homes, or invest savings in a safe and profitable way. The interest of the borrower is linked with that of the investor in such manner that both is materially advanced. When the payment of the shares, together with the net profit, amounts to the maturity value, they shall be fully matured and paid, and no more payments shall be required, and the holder shall be entitled to receive the full face value of each share. 'Class A' or 'General Shares.'—The maturity value of this class of shares is $50 each, and are estimated to mature in about seventy-two months from their date, and the monthly installment, which is 35 cents on each share, must be paid on or before the 5th day of each month, without notice. An applicant for a loan must carry shares in 'Class A' equal at their maturity to the face value of the loan. His shares must be six months old, or he must pay or cause to be paid six months' installments, in advance, before his application for a loan will be considered. Loans are not made for longer than six years." In said prospectus, under the title 'Illustration,' is the following, showing the estimated cost of a $1000 loan to the holder of twenty shares in 'Class A':—

"Membership fee ...........................$10.00
"Monthly installments ......................  7.00
"Monthly interest .........................  8.33 1-3
"Contingent fund .........................  1.00

"Seventy-two monthly installments ..........$16.33 1-3—$1,176.00
"Cancellation fee, 25 cents per share........              5.00

"Total cost to borrow in 72 months.......           $1,191.00"

And under the head of "Safety of the Investment" is the following: "The association takes the maximum risk at the time the loan is made, and every payment of monthly installment thereafter reduces the debt, while the security remains the same. All shares in 'Class A' are estimated to mature in about six years from their date, and at maturity any member may withdraw such shares and receive $50 therefor. While it can not be stated with absolute certainty what time it will require for these shares to mature, yet the experience of building and loan associations, and reliable, safe mathematical calculations make six years a conservative estimate for the maturity of shares under this plan."

On the 25th day of August, 1892, the appellants and appellee entered into a written contract, properly signed and acknowledged, whereby the latter agreed to build a house, according to certain plans and specifications, for appellants on certain lots situated in Ennis, Ellis County. And in consideration of this agreement appellants agreed to pay the appellee $500, and to pay said association the sum of $3.50 on their ten shares of stock until the maturity of said shares, as provided for in the plan and by-laws, which were made a part of the contract. They also agreed to pay, as interest on the $500, the further sum of $4.16 2-3 per month from the 25th day of August, 1892, till the maturity of their ten shares of stock. The contract contained provisions in relation to insurance, taxes, etc., not necessary to state here. To secure the payment of the above sums of money, interest due thereon, all dues and fines, as prescribed in the by-laws of the association, and reasonable attorney's fees (if judicial proceedings should be used in collecting said sums of money, or in foreclosing the lien given), it was agreed between the parties that the association should have a mechanic's and builder's lien on the house and lot.

The house was built according to plans and specifications with the $500 loaned and furnished by the association, half of which was paid out by the association on October 15, 1892, and half on the last of that month.

The payments made by appellants, excluding membership fee of $7.50, are as follows:

"Advance payment on stock............................. $21.00

"Monthly payments on stock, $3.50 Aug. 5, 1892, to Aug. 5, 1899, inclusive ................................... 294.00

"Aggregate payments on stock.......................... $315.00

"Interest payments, $4.20 Aug. 5, 1892, to Aug. 5, 1899, inclusive ......................................... 352.80

"In full payments ...................................... $667.80"

No payments were made after Aug. 5, 1899.

Appellee's secretary, W. B. Connor, testified that "the exact amount of interest on the $500 loaned, at the rate of 10 per cent per annum, would be $4.16 2-3 per month, but we collected $4.20 per month be-

cause it was a small matter and even figures. These collections were made each month to local boards, on collection sheets sent out by the home office, and the collection sheets were sent out showing $4.20 per month to save trouble in going into fractions."

*Opinion.*—The principal questions raised by the assignments are: (1) Were antecedent and contemporaneous acts and declarations of the parties admissible in evidence for the purpose of showing the contract was a device to cover up usury? (2) Was it error for the court, under the facts stated, to withdraw the question of usury from the jury, and peremptorily instruct a verdict for the defendant? If the first question should be answered in the affirmative, it might not be necessary to consider the second. But as both are germane to the issue of usury, and so intimately connected as to be hardly severable, they will be considered together.

Upon the first question the trial court ruled, when such testimony was offered by the appellants, that neither antecedent nor contemporaneous acts and declarations were admissible upon the issue, because they would tend to change or vary a written contract. Upon its face the contract is not usurious. Building Assn. v. Goforth, 59 S. W. Rep., 871.

If such antecedent or contemporaneous acts and declarations of the parties to a contract as surround and are connected with the transaction can not be used to illuminate and cast the light of truth upon it, then, however much it may have been intended as a device to hide usury, it must remain forever shrouded in darkness, and our law against exorbitant interest rendered a dead letter.

In Mitchell v. Napier, 22 Texas, 128, it is said: "It is quite immaterial in what manner or form, or under what pretense it is cloaked, if the intention was to receive a greater rate of interest than the law allows for the use of money, it will vitiate the contract and taint it with usury. Whether the transaction was so intended, where, upon its face, it does not appear to be usurious, is a question of intention for the decision of the jury." In the construction of a contract alleged to be usurious, the chief aim should be to ascertain the intention of the parties; and the mere form of the contract is immaterial, except in as far as it is one of the most conspicuous circumstances evidencing the intention of the parties. Webb on Usury, sec. 203.

In Moroney v. Loan Association, 116 North Carolina, 21 Southeastern Reporter, it is said: "The courts have always said that in usury cases they 'look through all disguises to the real nature and truth of the transaction.' The shifts and devices of avarice are countless in attemping to evade the protection which the law-making power sees fit to erect against its exactions. Calling 'interest' by the name of 'premiums,' 'fines.' and 'penalties' is a threadbare device." 

In Rowland v. Association, 116 North Carolina, 877, 22 Southeastern Reporter, the same court said: "We reiterate what this court said in the case of Mills v. Association, 75 North Carolina, 292,—'We know

of no device or cover by which these associations can take from those who borrow their money more than the legal rate of interest, without incurring the penalties of our usury laws. Calling the borrower a "partner," or substituting "redeeming" for "lending," or "premium" or "bonus" for an amount which they profess to have advanced, and are yet withholding; or "dues" for "interest," or any like subterfuge, will not avail. We look to the substance.' "

Whether or not a contract is a device to cover usury can not ordinarily be determined as a matter of law. "It is a question of fact to be determined on trial where the court can *go behind the returns,* and inquire and ascertain the intent and motives of the parties." Stephens v. Staples, 65 N. W. Rep., 959. Where the transaction disclosed by the evidence is per se usurious, the court is authorized to charge the jury to that effect. If, however, there is doubt as to whether the transaction is a cover for usury, or a perfectly fair one authorized by law, then it is a question for the jury to determine, from all the facts and circumstances of the case, whether the transaction disclosed is bona fide, in the ordinary course of business, free from the taint of usury, or whether it was a mere cloak and device, under the form of an ordinary business transaction to obtain more than legal interest. Bank v. Spencer, 107 Ga., 629, 33 S. E. Rep., 878; Callaway v. Butler, 97 Ga., 356, 7 S. E. Rep., 224.

An usurious agreement is not absolutely void; it is illegal, and this fact it would be probably impossible to prove except by oral testimony. Webb on Usury, sec. 425. Hence it was held by this court in Roberts v. Coffin, 22 Texas Civil Appeals, 127, that a contemporaneous parol agreement to pay 18 per cent interest, instead of 10, as stipulated in the contract, could be proven on the issue of usury. And we understand the law to be firmly settled that any evidence surrounding and so connected with a transaction as will throw light upon it and disclose, or tend reasonably to show, its true character, is admissible upon the issue of usury, although the contract is in writing and appears upon its face fair and legal.

In this case the appellants sought to show that their sole object in subscribing for the shares of the association was to obtain the loan of $500, and that their purpose was known to its agent with whom the loan was negotiated; that the stock subscription was a part of the transaction which culminated in the contract sued on, and that both parties, when the loan was being negotiated for, considered the so-called monthly stock installments as payments on the principal, and so treated them in estimating, from appellee's prospectus, when the debt would mature. If there was an understanding between the parties at the time appellants subscribed for the stock that Mrs. Peightal was not in fact to become a stockholder in the association, but subscribed for the shares simply for the purpose of borrowing money, with the understanding on the part of appellee, or the agent representing it in the transaction, that the monthly stock payments should be received as payments of and in reduction of

the debt, the transaction would be usurious (Association v. Thompson,. 58 Southwestern Reporter, 202), and the stock subscription and the monthly installments provided by the contract as payments thereon. would be regarded as subterfuges, made simply for the purpose of hiding the true character of the transaction. If, however, although it may have been appellant's purpose in subscribing for the stock to borrow money, and though this purpose may have been known to appellee,. yet if it was the intention of the parties that the stock installments were to be received by the association as bona fide payments on appellant's shares, and not as payments upon and in reduction of the principal on the money loaned, the transaction would not be usurious. In determining this question, it would be legitimate to inquire what was done by the association with the money it received from its borrowing members purporting to be monthly payments on their stock subscriptions. Did the association appropriate it as its own, ignoring any right or interest of such borrowing members in it? If so, a jury might consider such appropriation as a cogent circumstance tending to show the required subscription for stock was simply a device to conceal usury. On the other hand, did the association, in the interest of its members, invest or seek to invest the money received from its borrowing members with a view to crediting them upon the stock subscribed for with the profits of such investment? If it did, this would tend strongly to show the transaction was not tainted with usury. Association v. Goforth, supra.

The contention of appellants, that the taking by appellee as interest of $4.20 instead of $4.16 2-3 per month, ipso facto shows usury can not be maintained. "Where the amount of interest taken above the legal rate is trivial, the maxim 'de minimis non curat lex' is applicable. The taking of an insignificant amount would have a tendency rather to disprove than to prove usury; for anyone intending to take more profit upon a loan of money than the law would hardly be content with an exceeding small amount." Webb on Usury, sec. 210. Besides, it is apparent that this insignificant amount in excess was paid simply for the convenience of both parties, with the intention of deducting such excess from the last payment.

Some question is made as to whether it is competent to permit the parties to the transaction to testify to their intentions. In cases where the motive or intention actuating a party is the subject of inquiry, it has been held in this State that the witness could testify what his motive or intention was. Hamburg v. Wood, 66 Texas, 168; Brown v. Lessing, 70 Texas, 545; Sweeney v. Conley, 71 Texas, 545. And it seems the same rule applies in cases where the question of usury is involved. Webb on Usury, sec. 424.

We are of the opinion that the court erred in refusing to admit the parol testimony offered by appellants to show that the contract was usurious, and in peremptorily instructing the jury to find for the plaintiff. Therefore, the judgment is reversed and the cause remanded.

*Reversed and remanded.*