**DALE et al. v. SIMON et al. (No. 1395.)** *

(Court of Civil Appeals of Texas. El Paso. Jan. 18, 1923. Rehearing Denied Feb. 21, 1923.)

1. **Payment** ⬗89(5)—**Evidence in action to recover back rent held sufficient to show rent paid under duress.**

Evidence, in an action by two joint lessees, A. and B., under an oil and gas lease to recover back from the lessors rent not due under the terms of the lease, *held* sufficient to show that as to lessee A. the rent payment was not voluntary, but was paid under duress by threat of forfeiture of lease.

2. **Payment** ⬗88—**Mere protest against payment of charge does not entitle one to recover back.**

A mere protest against a charge does not entitle one to recover it back who voluntarily and without duress or compulsion pays it.

3. **Reformation of instruments** ⬗25—**Lessor held not entitled to reformation of lease where, of two joint lessees, contract as written evidenced true lease with one of lessees.**

Where, of two joint lessees, A. and B., under an oil and gas lease, the contract of lease as written evidenced as to lessee A. the true contract with the lessor, but as to the other lessee, B., did not evidence the true lease, the lessor *held* not entitled to have the lease reformed, where, because the interests of the lessees were indivisible, it became impossible to reform the lease without affecting A.'s interest, and in effect imposing upon him a new contract which he never made.

4. **Payment** ⬗87(1)—**One of joint lessees held entitled to recover one-half of rent not due, but paid under duress; other joint lessee held precluded from recovering because lease as written did not embody true lease agreement.**

A lessor demanded $22,000 as rent from two joint lessees, A. and B., as being due on the lease. Under the terms of the lease as written and as lessee A. understood the agreement to be, no rent was due, but, as to lessee B., he knew the rent was due, and that the lease contract did not embody the real agreement with the lessor. A. and B. paid the $22,000 under duress by threat of forfeiture of lease, and later brought an action against the lessor to recover the money so paid. *Held*, since the payment by A. was one he was not required to make under the lease as written and as understood by him, he was entitled to recover one-half of the $22,000 paid, but, as to B., though his share of the payment might be technically regarded as an involuntary payment, it was in conformity with the true agreement and constituted a payment which, in equity and good conscience, he should have made, thereby precluding him from recovery of the other one-half of the rent paid.

**5. Mines and minerals ⬤⇒78(2)—Oil and gas lease held not ambiguous so as to prevent construction by court as to rentals to be paid to prevent forfeiture.**

In an action to recover rent paid under duress, *held*, that an oil and gas lease was not ambiguous as to rentals to prevent forfeiture where wells were not begun within specified time, and there was no error in instructing as to its legal effect.

**6. Trial ⬤⇒350(4)—Refusal of special issue on uncontrolling issue held not error.**

Where, in an action to recover rent claimed by the lessor of an oil and gas lease to be due and paid by the lessee under duress, the issues were as to whether the rent paid was due under the lease as written and whether the rent was paid under duress, it was not error to refuse special issue as to the lessor's good faith in demanding the rentals, as that issue was immaterial, and not an ultimate or controlling one in whatever finding might have been made.

**7. Mines and minerals ⬤⇒58 — Evidence held not to show agency between lessees so as to impute to one knowledge of other as to mistake in lease.**

Evidence, in an action by lessees to recover rentals claimed to have been paid under duress to prevent a forfeiture, *held* not sufficient to show agency between lessees so as to impute to one as principal the knowledge of the other as agent of a mistake in the lease and mutual mistake of the latter in making the contract.

**8. Mines and minerals ⬤⇒58—Agency or partnership between signers of lease held not to work estoppel to deny validity.**

Where an oil and gas lease was submitted to lessees, and each signed the same for himself, the agency of one for the other in securing the lease, or a partnership between them, has no application as to whether one was estopped to say that he did not understand the writing as understood by the other, who secured the lease and had notice of a mistake therein.

**9. Payment ⬤⇒89(5)—Evidence held to show prima facie that lessee paid lease rent under duress.**

Where, in an action by two joint lessees, A. and B., to recover rent not due under the oil and gas lease, but paid by A. under duress, where there was evidence that lessee A. was looking after the legal end for both lessees and combated the payment of any part of the rentals demanded of both lessees, and that B. stood in the same attitude of A., and paid when and as A. did, and that, if payment had not been made, forfeiture of the lease would have been declared as to both, such facts were prima facie evidence that B. paid under duress as well as A.

**10. Trial ⬤⇒350(4)—Where each lessor signed lease for himself, held not error to refuse submission of issue of agency existing between lessors.**

In an action by two joint lessees under an oil and gas lease to recover rent not due, but paid under duress, in which action the lessors interposed the defense that the contract as written did not embody the true lease agreement, *held*, where each party to the contract, lessees as well as lessors, signed the agreement each for himself, and the lease was so written, and the parties so understood it, it became immaterial whether one of the lessors acted as agent for the other lessor, and hence the refusal to submit the issue of agency between J. D. and J. B. as lessors was not erroneous.

**11. Payment ⬤⇒89(5)—Evidence held admissible on issue of duress.**

In an action by two joint lessees under an oil and gas lease to recover from the lessors rent not due, but paid under duress, testimony by one of the lessees of the sales of leases made by the lessees, based upon their agreement to drill wells, and of the contents of transfers in writing relating to contracts made with purchasers of oil leases and the amount involved and the kind of contracts made, without accounting for the absence of such writings, and testimony as to why the lessees made the rent payment, was admissible on the issue of duress as going to the facts and circumstances that influenced the payment of rentals.

Appeal from District Court, El Paso County; P. R. Price, Judge.

Suit by U. M. Simon and another against J. E. Dale and others. Judgment for plaintiffs, and defendants appeal. Affirmed as modified.

Wantland & Dickey, of Henrietta, Taylor & Allen, of Fort Worth, and Lea, McGrady, Thomason & Edwards, of El Paso, for appellants.

Ocie Speer and Slay, Simon & Smith, all of Fort Worth, and Turney, Burges, Culwell, Holliday & Pollard, of El Paso, for appellees.

WALTHALL, J. Appellees, U. M. Simon and Dan Brown, brought this suit against appellants, J. E. Dale, J. T. Dale, and the heirs of J. B. Dale, now deceased, to recover back $22,000 alleged to have been paid by appellees to appellants under such stress, advantage, and coercion as amounted to duress of property, or moral duress, alleging that appellants had leased to appellees for development for oil and gas a tract of 22,000 acres of land in Clay and Archer counties, in this state, and pleading the provisions of said lease contract, and setting out a copy thereof of date May 29, 1919, and by provision and reason of which appellees alleged they could keep such lease in force from year to year for four successive years next after the first year, either by payment of $1 per acre or by beginning a well for oil and gas on or before April 30th of each succeeding year for four years next after the first year, without production, and pleaded a provision in the lease contract reading, "But in this connection it is agreed that the com-

pletion of a well which produces oil or gas in paying quantities shall hold only the 640 acres surrounding it, with such well as near the center thereof as may be practicable, without further cash rental, but as to all other acreage the provisions for cash rental as in this paragraph [third paragraph] contained, remains in force," appellees, lessees, paying one-eighth royalty of oil, and annual cash rental in amount stated for gas, that appellees entered upon constructive possession of said leased lands for the purposes authorized, and prior to the 30th day of April, 1920, commenced three wells as test wells for oil and gas and continuously and diligently prosecuted the drilling same until said date, but that on said date (April 30, 1920) neither of said wells had been completed to production. It was alleged that the beginning of said wells operated under the terms of said lease to continue said lease in force without the further payment of any sum. Notwithstanding said lease contract and its rental terms, and notwithstanding the commencement of said wells, appellants about April, 1920, wrongfully claimed that appellees were due to pay them, under the terms of said lease contract, $1 per acre, amounting to the sum of $22,000, as rentals, and demanded of appellees the payments of said sum as rentals, and insisting that, if same was not paid by April 30, 1920, appellants would declare a forfeit of said lease and oust appellees from said premises, whereupon appellees paid said sum under protest and duress, which payment, appellees alleged, they were compelled to make to protect their financial interests, in this: Appellees had made and had outstanding existing contracts for the assignment and sale of a large portion of the lease upon said lands for large sums of money partly paid and partly unpaid, and conditioned upon the completion by appellees of a test well or wells to a specified depth upon some of said lands, and which depth had not been reached in drilling, and that for that and other reasons specially pleaded by appellees, but not necessary to further here state, and that by reason of which, if appellants forfeited the said lease and ousted appellees and those holding under them, appellees would sustain a loss of many thousand dollars, and subject them to large damage suits, and cloud their title to said lease, to their irreparable injury.

Appellants answered by general denial, and further that the writing, signed by appellants and appellees, due to mutual mistake as to its contents, and also as to the meaning of terms used in the writing, did not state the real contract made by the parties, in this: It was the real contract that appellees, in addition to the down payment of $110,000 made when the contract was signed, should pay $1 per acre per year on or before April

248 S.W.—45

30, 1920, 1921, 1922, and 1923, for the 22,000 acres, save that for such 640-acre tract as might have producing wells, as such sections as appellees might test out and release back to appellants; that no producing wells were had nor sections released back to appellants. The answer specifically sets out in detail how the alleged mutual mistake in the writing came about. The answer also contained a cross-action against appellees for $22,000, alleged to be the installment due April 30, 1921. The answer further prayed for a reformation of the writing and recovery of $22,000 and general relief. Each party filed supplemental pleadings, and we will further state such additional matters as may seem necessary in the discussion of the several propositions presented.

The case was tried with a jury and submitted upon special issues. Upon the issues submitted the jury found:

(1) Prior to the execution of the lease contract it was, in substance, verbally agreed between J. E. Dale and Dan Brown that the Dales should lease the land in question for a period of five years for $5 per acre for the first year, and $1 per acre per annum unconditionally for the next four years, with the qualification that a producing well or a dry hole should release 640 acres on which it was located from future rentals.

(2) In respect to the matter inquired about in question No. 1, through mutual mistake of J. E. Dale and Dan Brown, a different term was written into the contract of date the 29th day of May, 1919.

(3) At the time they signed the typewritten lease, both Dan Brown and the Dales believed that its terms, as actually written, meant and required unconditionally the payment of $1 per acre as rents for the next four years after the first year, with the qualification that a producing well or dry hole would release 640 acres surrounding it from rentals.

(4) At the time they signed the typewritten lease, Dan Brown and U. M. Simon, as lessees, and the Dales, as lessors, did not believe that its terms, as actually written, meant and required unconditionally the payment of $1 per acre per annum as rent for the next four years after the first year, with the qualification that a producing well or dry hole would release 640 acres surrounding it from future rentals.

(5) The payment by plaintiffs to defendants of $22,000 on or about April 29, 1920, was made under duress.

In response to supplemental issue A the jury found: T. A. Dale and J. B. Dale, at the time they fixed their signatures to the lease introduced in evidence, dated May 29, 1919, did so with the mistaken belief that said lease contained the unconditional term that the lessees were to pay for the land after the expiration of the first year at the rate of $1 per acre per annum, with the

qualification that a producing well or dry hole should release the 640 acres on which it was from future rentals.

On the above findings of the jury, the court, on motion of appellees, entered judgment in their favor for $22,000, with interest and costs, and that appellants take nothing by their cross-action, from which judgment this appeal is prosecuted.

Under the first proposition the contention is made that the evidence is insufficient to show duress, in that no force or violence was offered or threatened appellees, and their drillers were in peaceable possession of the premises with their equipment, and the only thing done by appellants was their declaration that they would forfeit the lease if the rental was not paid.

Under the above appellants concede as a legal principle that there may be duress of property, as well as duress of the person, but insist that, to amount to a duress of property, there must be some form of coercion; otherwise the payment of the $22,000 would be a voluntary payment, and not under duress of property, and a suit to recover the amount paid would not lie. Appellees make the counter proposition that the evidence is sufficient to show duress of property in that appellees' rights under the lease contract were subject to termination and forfeiture by appellants for nonpayment of rentals under certain contingencies, and the appellants wrongfully demanded of appellees the payment of such rentals under the threat and penalty of declaring such forfeiture if such rentals were not paid, and having the power, or apparent power, to enforce such demand and declare such forfeiture against appellees' property without any resort whatever to the courts. It is further insisted by appellees under this proposition that the evidence shows such payment was not voluntary, but under duress, in this, that the appellees' business of drilling and developing said lands and as selling acreage thereof was threatened and jeopardized by the acts of appellants in threatening such forfeiture, and that such payment was made only for the purpose of protecting such business for serious injury; that the evidence further shows that the threatened forfeiture by appellants was of such a nature as, under all the circumstances at the time, to deprive appellees of the power of exercising their own free will in the matter, and did so deprive them in the matter of making such payment as to constitute duress.

The lease pleaded and shown in the record contained the following stipulation:

"If no well be commenced on said land on or before the 30th day of April, 1920, this lease shall terminate as to both parties unless the lessee on or before that date shall pay or tender to his lessor, or the lessors' credit, in the Dale Bros. & Co. Bank at Henrietta, Tex., or its successors, which shall continue as the depository regardless of the changes in the ownership of said lands, the sum of $1.00 per acre per year, which operates as a rental and covers the privilege of deferring the commencement of a well for twelve months from said date. In like manner and upon like payments or tenders, the commencement of a well may be further deferred for like periods of the same number of months successively.

"And it is understood and agreed that the consideration first recited herein, the down payment, covers not only the privileges granted to date when first rental is payable as aforesaid, but also the lessees' option of extending that period as aforesaid, and any and all rights conferred, but in this connection it is agreed that the completion of a well which produces oil or gas in paying quantities shall hold only the 640 acres surrounding it, with such well as near the center thereof as may be practicable, without further cash rental, but as to all other acreage, the provisions herein for cash rental as in this paragraph contained, remains in force.

"Should the first well drilled on the above-described land be a dry hole, then and in that event, if a second well is not commenced on said land within twelve months from the expiration of the last rental period, which rental has been paid, this lease shall terminate as to both parties, unless the lessee, on or before the expiration of said twelve months, shall resume payment of rental in the same amount and in the same manner as herein provided.

"And it is agreed that upon the resumption of the payment of rentals as above provided that the last preceding payment hereof, governing the payment of rentals, and the effect thereof, shall continue in force just as though there had been no interruption in the rental payments."

Without quoting the evidence at length and without at all times using the words of the witness, except when quoting, it shows that the lessees, appellees here, entered into constructive possession of the land under the lease immediately upon its execution and delivery for the purposes for which the lease was given. Appellees commenced actual drilling—that is, going into the ground with the drill—on the first well on April 13, 1920, and on the second well on April 28, 1920, and on the third well a short time later. The first well was prosecuted continuously from its beginning. It was appellees' purpose to make sales of leases. Appellees had paid $110,000 for the lease. The wells were located on different points on the land, and appellees began then to sell acreage based upon agreement to drill and complete three wells to depths of 2,000 feet unless oil or gas was found in paying quantities at a less depth. Appellees sold several thousand acres to as many as 25 persons, and the amount of such sales involved something over $100,000. Prior to April 30, 1920, appellees had made contracts with drillers for the purpose of drilling the wells to the depth stated. Shortly prior to April 30, 1920, appellee Simon

learned that appellants were claiming that rentals would be due under the lease on April 30, 1920. Appellee Simon, in company with his attorney, went to personally see appellants in the matter of the rentals. At the conference the matter of rentals becoming due on April 30, 1920, was discussed with appellants, appellee Simon contending that under the terms of the lease rentals would not be due, the actual drilling of a well having then commenced, appellants contending that rentals would be due on April 30, 1920, regardless of the fact that the drilling of a well had actually commenced. At the interview the lease contract was read and discussed. Appellee Simon told appellants of the obligations appellees had assumed with other parties as to sales and to drill wells as above stated, and the consequent result to them from a business standpoint if their obligations were not carried out; that appellees would be subjected to lawsuits, and their business integrity impaired; that, if appellants insisted on the payment of the rentals or a forfeit of the lease as an alternative, appellee would be compelled to pay the rentals to avoid the consequences above stated; but insisted that the demand of appellants as to payment of the rentals was wrongful and unlawful. Appellants demanded the payment of the rentals. Appellees then submitted a proposition to the effect that appellees would deposit the rentals in appellants' bank at Henrietta, and one or the other bring a suit and let the courts construe the terms of the contract as to the payment of the rentals. Appellant did not agree to the proposition, but did agree to consider the matter further and advise appellees on their return to Fort Worth in the afternoon of the same day. On the following day appellee Simon received from appellant J. E. Dale the following telegram:

"My brother concurs in my position that unless rental for next twelve months paid on date specified in lease that a forfeiture must be declared. We are unwilling to make any agreement at time of payment which might complicate litigation of any kind as we consider this voluntary payment believing ourselves justified in this position as can now only advise you that unless rental paid forfeiture will be declared and we will not entertain any other proposition if you desire payment may be made at Fort Worth National Bank to our credit which we will consider as payment made in Henrietta. J. E. Dale."

Appellee Simon duly received the above message and promptly made the payment as directed in the message of the $22,000. At that time each of appellees was solvent in the ―――― of the amount in controversy. In the conference between appellee Simon and appellants at Henrietta, Judge Speer, then one of counsel for appellees, and present at the conference, stated to appellants that the payment of the rentals would not be voluntarily made, but, if made, it would be made because of the position taken by appellants that, if the payment was not made, the forfeiture of the lease would be declared, and that the payment would be made purely upon appellants' threat to forfeit the lease unless the payment was made as demanded. The payment was made under the conditions stated above.

The question is presented: Is the evidence sufficient to show that the payment of the rentals was made under duress, or does the evidence show a voluntary payment?

Appellants refer us to Smith v. Adams, 27 Tex. 28, Johnson v. King & Davidson, 64 Tex. 226, and Pye v. Cardwell, 110 Tex. 572, 222 S. W. 153, as sustaining their contention, but we are of the opinion that the cases are not in point. We will not review the cases at length, but, for the sake of brevity, only refer to them for the facts upon which the opinions are based. In each case suits were brought for damages, and the opinions of the cases state in effect that damages will not be awarded for the prosecution of civil suits, though brought with malice and without probable cause, unless by reason of the suits the party sued suffers some interference with his person or property. We concede, under the above authorities, that if the Dales had not assured appellees that a forfeit of the lease would be declared, but had sued to rescind the lease for nonpayment of the rentals, a suit for damages by reason of the suit would not lie. But such is not this case.

[1] In Ladd v. S. C. P. & M. Co., 53 Tex. 172, Ladd sued the appellee company to recover back money paid on cotton intrusted to them. The right to recover was claimed on the ground that the payments had been made on unlawful demands and without consideration, involuntarily, and under duress. The duress claimed was by reason of an alleged combination to charge a larger amount than the services were reasonably worth, and for the delivery of cotton which Ladd said was not in fact actually delivered, and the agreement between appellee and its confederates not to do business with any parties who should refuse to pay any of their charges, or resort to the courts to controvert or dispute them. The court held that the payment of unreasonable charges to the cotton compress company, with knowledge of the facts, and without fraud, deception, or duress, cannot be recovered back. A mere protest against the charge does not entitle one who voluntarily and without duress or compulsion pays it to recover it back. The court further said:

"To entitle a party voluntarily paying money to recover it back on the ground of duress, he must, at the time of such payment, be under the necessity of either then making the payment, or of resorting to the courts to get possession of property wrongfully detained, or to

recover his liberty, or at least show that there is an apparent necessity for resorting to the courts for one or the other of these purposes."

It was said by the court in that case, in applying the facts, that Ladd—

"certainly had ample time and opportunity to have had his day in court, before the business between him and appellee was closed by the last voluntary payment made by him. Not having complained until the late date at which this suit was brought, he cannot now be heard to complain."

We do not place the same construction on the above-quoted telegram as do appellants; that is, make a voluntary payment and end the matter, or keep their money and stand a suit.

Appellees proposed to appellants the payment of the money into appellants' bank, and a friendly suit to determine the questions involved, but the proposition was declined. As we view it, both in the interview at Henrietta and as finally expressed in the telegram, appellants would entertain no proposition other than the immediate payment of the rentals or a forfeiture of the lease. Appellants in the telegram did venture to express their opinion that the payment, if made, would be a voluntary payment, but that is one of the difficult and disputed matters at issue. Appellants possibly rested their expressed opinion and insistence on an unconditional payment of a forfeiture on their contention of a mutual mistake in the portion of the lease set out above, but the finding of the jury is against such contention. In discussing this proposition we assume that there was no mutual mistake as to all parties on each side, in any portion of the lease as executed and delivered.

Both parties refer us to Ward v. Scarborough, 236 S. W. 434. The issues there are lengthy, and we must refer to the case for the issues there made as stated by the Commission of Appeals, and as stated by this court and referred to by the Commission of Appeals. The court there said:

"To constitute duress it is sufficient if the will be constrained by the unlawful presentation of a choice between comparative evils as inconvenience and loss by the detention of property, loss of property altogether, or compliance with an unconscionable demand. 9 R. C. L. p. 723; Harris v. Carey, 112 Va. 362, 71 S. E. 551, Ann. Cas. 1913A, 1350.

"Duress of property cannot exist without there being a threat to do some act which the threatening party has no legal right to do— some illegal exaction or some fraud or deception. The restraint must be imminent and such as to destroy free agency without present means of protection [giving references which we omit]. The restraint, intimidation, or compulsion is sufficient if it induces the particular person claiming duress to perform some act which he is not legally bound to do, contrary to his will."

The court draws a distinction between certain classes of cases, and holds that, in cases in which one party was in a position to inflict irreparable injury to the property interests of another if compliance with the unlawful demand is refused, duress may exist, although some measure of relief may have been secured by an action in the courts, and gives references to a large number of cases making such distinctions, and holding as above. At the expense of being lengthy, we will briefly state the facts upon which the above statement as to duress is based. The Scarboroughs were the owners of valuable lands subject to a mortgage. E. G. Ward's father was agent of the mortgagee, and by parol had extended the time of payment of an overdue installment of interest and waived his right to declare the entire indebtedness due. The Scarboroughs had negotiated a sale of the property. E. G. Ward's brother was acting as their agent in connection with the sale, but, as found, conspiring with E. J. Ward and their father, defeating the sale by false representations as to value of the property. The father thereupon demanded immediate payment of the debt in full, and threatened to sell the land under a power of sale under the instrument. The Scarboroughs were thereby induced to sell the land to E. J. Ward for less than its value, being unable to pay the debt or give bond to enjoin the sale. The court, under the above facts, briefly stated, held that the sale was under duress and involuntary. The father of E. J. Ward had waived his right to declare the entire indebtedness due, and the threatened sale of the property was a threat to do an act he had no legal right to do, and constituted such restraint or intimidation on the part of the Scarboroughs as to cause them to make the sale contrary to their will.

We concur in the suggestion made by appellees that the very gist of the circumstances and facts showing duress lies in the fact that appellants had it in their power to declare a forfeit against appellees, and to declare a present termination of their lease as for nonpayment of rentals, and to do this it was not at all necessary or expedient, from appellants' standpoint, to resort to the courts at all.

Appellants were not threatening a suit, but the evidence clearly shows that they were threatening a declaration of forfeiture of the lease as contradistinguished from a suit to recover the rents or to establish a forfeiture. Such declaration of forfeiture, as we view it, is more than a threat to sue, as it would afford appellees no day in court, no opportunity to be heard or to protect themselves against such action or the conse-

quences to appellees resulting therefrom. Such threatened action was well calculated to, and from the evidence heard most probably did, deprive appellees of the exercise of their free will in the matter of the payment of the demand made, rather than to suffer the consequences of a refusal.

[2] It seems to us that as to Simon the evidence is sufficient to show that the payment of the rentals was not a voluntary payment, but was paid under duress.

Under the second proposition it is insisted that the judgment is in conflict with the verdict, in that under the verdict appellee Brown was not entitled to recover of appellants, but, on the contrary, appellants were entitled to recover of him.

The findings of the jury are shown above. Without quoting the evidence under this proposition, the insistence of appellants is to the effect that the answers of the jury to questions 1, 2, 3, and supplement A establish beyond dispute that the writing, because of mutual mistake, did not evidence the real contract between appellee Dan Brown, on the one side, and the three Dales, on the other, and that as to these parties the contract was as contended by appellants. The evidence shows that after Brown, J. E. Dale and J. T. Dale and J. B. Dale, the latter signing through J. E. Dale, had signed the contract in its present condition at Henrietta, the contract was then taken to Fort Worth, where Simon signed, then J. E. Dale and Brown took the contract to Dallas, where J. B. Dale signed in person, and where it was finally delivered, and Brown paid the down payment.

[3] We concur in appellants' view of the effect of these findings, and are of the opinion that the appellants would be entitled to a reformation of the contract as against Brown if it were not for the fact that there was no mistake upon Simon's part, and a reformation as against Brown cannot be made without at the same time reforming as against Simon. The interests of Simon and Brown are indivisible, and it is impossible to reform as to Brown without adversely affecting Simon's interest and in effect imposing upon him a contract which he never made. If the contract were divisible, the Dales would be entitled to a reformation against Brown. But, being indivisible, appellants have no right of reformation, and the trial court properly denied them any relief of that nature.

[4] The evidence discloses that Simon and Brown were jointly and equally interested in the lease. As to Simon the payment made by him was one which he was not required to make under the contract which he had made, and such payment was made under duress. He is therefore entitled to recover back his one-half of the $22,000 paid to the Dales.

But as to Brown his share of the payment was in conformity with the true agreement which he had made with the Dales, and which agreement by their mutual mistake had not been expressed by the written agreement. Under such circumstances the payment of his one-half of the $22,000 should not be regarded as a payment under duress. In other words, a payment which, in equity and good conscience, he should have made, ought not to be regarded as a payment under duress of property.

But, if it may be technically regarded as an involuntary payment under duress, still the right to recover back such a payment arises upon equitable grounds. His right to recover is founded in equity. But, when he seeks to recover upon such grounds, he is confronted with the fact that he is without equity, for the payment which he made was one which in good conscience he should have made. And the only thing that relieves him from the legal obligation to pay upon a reformed contract arises out of the fact that he has a joint owner interested with him whose rights are entitled to protection, and which cannot be protected if such reformation be made. For the reason indicated, the second proposition is sustained.

From what has been said it follows, however, that in the future the rights of all the parties to the contract are governed by its terms as it was written.

The third proposition is directed to the court's charge construing the legal effect of the lease as written, but instructing the jury that the contract as written would not be controlling on the rights of the parties if signed under mutual mistake, and defining mutual mistake to be:

"A mistake which is common to the parties to both sides of the contract, and a mistake on the part of the parties to one side of the contract, unless it was common to the parties of the other side, would not be a mutual mistake, and would not affect the binding force of the contract, as same was written."

[5] Appellants' insistence of error is based upon their assumption and contention that the contract is ambiguous in its terms. We think the contract is not ambiguous with reference to its rental stipulations. We have stated that portion of the contract and need not repeat it here. The language used has often been construed that the beginning of a well within the specified time will prevent the forfeiture and excuse the payment of rentals. Gillespie v. Fulton, 236 Ill. 188, 86 N. E. 219; Brown v. Vandergrift, 80 Pa. 147; Dill v. Fraze (Ind. App.) 77 N. E. 1147; Brewster v. Co., 140 Fed. 801, 72 C. C. A. 213.

The stipulation of the lease follows the usual commercial lease 88 form. We think the only serious question presented in the

charge is the one of fact submitting the issue of mutual mistake already discussed.

[6] The refusal of the court to submit appellants' requested special issue as to the Dales' good faith in believing that the demanded rentals were due them is made the basis of the fourth proposition. In this we think there was no error. The issue was immaterial, not an ultimate issue, and uncontrolling in whatever finding might have been made.

Proposition 5 in effect complains of the judgment in awarding a recovery, insisting that Brown acted for himself and for Simon as agent, accepted the benefits and fruits of Brown's acts in effecting a contract, and that Simon, through Brown, had notice of the mistake in the writing, and is estopped to say he did not understand the writing as understood by the other parties. It is insisted that the evidence discloses such an agency and joint relation between Brown and Simon as that notice to Brown will be imputed to Simon as matter of law.

[7, 8] We have concluded that the evidence does not show such an agency on the part of Brown as to impute to Simon as principal all knowledge and notice, and mutual mistake of Brown in making the contract. True, they were acting jointly in securing the lease, and Brown secured the lease, but, we think, each acted for himself in its final acceptance, each signed for himself, the lease is so written, and the parties evidently so understood it. The propositions here contended for are discussed and held contrary to appellants' contention in Barker v. Pullman Co. (C. C.) 124 Fed. 555, and 134 Fed. 70, 67 C. C. A. 196, where the contract was submitted to and signed by the principal, where there was an admitted agency. There are some expressions in the evidence that they might have been acting as partners, in the matter of securing the lease, but that relation was not shown to exist. But whether Brown was agent, or that a partnership existed, under the above authorities, as the contract was submitted to and signed by the principal and each partner signed for himself, the fact of agency or partnership has no application.

Appellants submitted to the court several special issues tending to show that Brown and Simon were partners in negotiating for securing the lease, which issues the court refused to submit, and of which refusal appellants complain under proposition 6.

We have stated our views on this proposition in discussing point 5. It might be further added that, if the court had submitted the several issues, and the jury had made findings thereon in favor of appellants' views such findings would not have established any ultimate issue in the case.

We have discussed the matters presented in points 7 and 8 under other issues.

[9] Under the ninth it is insisted that to drill the wells.

there is no evidence that Brown paid under protest or fear of losses if he failed to pay. There is probably no direct statement that Brown in person protested against payment: But we, think the fact is sufficiently shown, at least prima facie, by the circumstances. Simon in his trip to Henrietta combated the payment of any part of the rentals. The rentals as to both Simon and Brown were demanded. Brown stood in the same attitude in every particular under the written lease, in the pleadings, and in the case as did Simon, and paid when and as did Simon. The evidence is that Simon was looking after the legal end for both, and when he speaks of what he did in the matter it seems clear his acts were for both. It is equally clear that, had payment not been made, the forfeiture for nonpayment would have been as to both. The jury's finding is that both paid under duress.

[10] In view of the fact that J. B. Dale signed the contract in person, it is immaterial, under the above authorities, whether J. E. Dale acted for him in negotiating the contract, and the refusal of the court to submit the issue of the agency J. E. Dale would not be reversible error as submitted under the proposition.

Propositions 11, 12, 13, and 14 become immaterial in view of the ruling made respecting Brown.

[11] The other propositions relate to objections made to parts of Simon's testimony. Simon, while testifying on direct examination said, in substance, that he and Brown, began making sales of acreage based upon their agreement in each case that they would drill and complete three wells, at designated points on the lease, to the depth of 2,000 feet, unless oil or gas was sooner found in paying quantities, which sales he said were by written transfers in some instances, but not in all. Appellants objected to witness testifying to the contents of the transfers in writing without accounting for their absence. The court overruled the objection, on the insistence of appellees that they were not suing on these contracts; that they were only collateral and could be proved by parol without producing the writings or accounting for their absence. The witness was permitted to state that appellees had sold as many as 6,000 or 8,000 acres to as many as 25 or 30 parties, and that the amount involved something over $100,000. He stated the companies and individuals to whom sales were made in writing. He further stated that in none of the sales was the consideration paid in full on April 30, 1920, but that in some instances the contracts were spudding in contracts; that is, part payment would be made when the well was spudded in, and balance when the well was completed. He stated the dates upon which written contracts were made with drillers to drill the wells.

The witness was asked "Why did you make the payment?" (referring to the rentals), to which the witness answered:

"I made the payment because I thought that the Dales would forfeit that lease if I did not make it, and I thought that as a consequence of that forfeiture, or their declared forfeiture, that they would take steps to dispossess me from the land; and those that were working for me. I thought that they would dispossess my drillers; would put them off the land."

The objections to the question and answer were that it was immaterial, irrelevant, and called for a conclusion. The witness further stated, "I knew that I would be subject to a damage suit by the Lucky Jack Oil Company," one of the drilling companies. (Same objection as last above.) The witness made similar statements as to others to whom sales had been made over similar objections.

Subsequently, and in rebuttal, appellees produced and read in evidence the drilling contracts, and some of the written lease contracts.

We have concluded that the evidence objected to was admissible on the issue of duress. The evidence goes to the facts and circumstances that influenced the payment of the rentals. Perhaps there could be no better source from which the evidence could be furnished than the testimony of Simon himself. International Land Co. v. Parmer, 58 Tex. Civ. App. 70, 123 S. W. 196; Wade v. Odle, 21 Tex. Civ. App. 656, 54 S. W. 789; Peightal v. Bldg. Co., 25 Tex. Civ. App. 390, 61 S. W. 428; Mayers v. McNeese (Tex. Civ. App.) 71 S. W. 68; Glasscock v. Stringer (Tex. Civ. App.) 32 S. W. 920; 10 R. C. L. p. 946, § 116; 22 C. J. p. 610, § 704.

The judgment of the lower court will be reformed as follows:

In favor of Simon for $11,000, with interest.

That Brown take nothing, and as to his suit the defendants go hence without day.

That defendants take nothing by their cross-action, and that as to such cross-action Simon and Brown go hence without day.

Simon recovers all of his costs.

One-half of all costs below and upon appeal are taxes against Brown, and the other one-half against the appellants.

As thus reformed, the judgment is affirmed.