DALE et al. v. SIMON et al. (No. 520–3976.)

(Commission of Appeals of Texas, Section A. Dec. 20, 1924.)

**1. Payment ⊕≈87(2)—"Duress" defined.**

"Duress," authorizing recovery of payment, must be a threatened act which the party threatening has no legal right to do, made in such manner as to cause the party threatened against his will to do some act which he is not legally bound to do, and against which he has no present means of protection.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Duress.]

**2. Payment ⊕≈87(3)—Payments under wrongful threats of injury to business or property interests, by one having apparent power to enforce threats without resort to courts, recoverable as made under "duress."**

A mere wrongful or unlawful demand for payment to enforce which resort to the courts is necessary is not "duress," the party upon whom demand is made having adequate protection, but where the person making the demand has power, real or apparent, to injure the business or property interests of the other without resort to courts, and threatens acts which

would cause such injury, payments made under such threats may be recovered.

**3. Payment ⊕≈89(5)—Evidence in action to recover back rent paid held sufficient to show payment under "duress."**

Evidence in action by joint lessees of oil and gas property to recover back from lessors rent not due under terms of lease, *held* sufficient to show that as to one lessee the rent payment was not voluntary, but was paid under "duress" by threat of forfeiture of lease.

**4. Payment ⊕≈89(5)—One lessee held precluded from recovering rent as paid under "duress" where rent was paid according to actual agreement of parties though not due under terms of written lease.**

Evidence in action by joint lessees to recover back from lessors rent not due under lease *held* not to warrant recovery by one of lessees for involuntary payment under duress, where such lessee understood at time lease was made that rent was to be paid as demanded by lessor, contrary to terms of written lease.

**5. Reformation of instruments ⊕≈25—Lessor held not entitled to reformation of lease where, as to one of two joint lessees, contract as written evidenced true lease.**

Where, as to one of two joint lessees under oil and gas lease, but not as to the other, the contract of lease as written evidenced the true contract with lessor *held* lessor was not entitled to have lease reformed, the interests of lessees being indivisible, and reformation being impossible without affecting interests of both and imposing upon one a contract not his.

Error to Court of Civil Appeals of Eighth Supreme Judicial District.

Suit by U. M. Simon and another against J. E. Dale and others. Judgment for plaintiffs was modified and affirmed by the Court of Civil Appeals (248 S. W. 703), and defendants bring error. Affirmed.

Wantland & Dickey and W. T. Allen, all of Henrietta, Lea, McGrady, Thomason & Edwards, of El Paso, and Taylor & Taylor, of Wichita Falls, for plaintiffs in error.

Slay, Simon & Smith and Ocie Speer, all of Fort Worth, for defendants in error.

BISHOP, J. Defendants in error sued plaintiffs in error to recover back $22,000 alleged to have been paid by defendants in error under duress.

The plaintiffs in error, J. E. Dale, J. T. Dale, and J. B. Dale, now deceased, entered into a lease contract, of date May 29, 1919, with defendants in error, U. M. Simon and Dan Brown, whereby plaintiffs in error granted, demised, released, and let unto the defendants in error, for the purpose of mining and operating for oil and gas 22,000 acres of land with the right of ingress and egress over said premises, for a consideration of $110,000, which was paid. It was in said

lease agreed that same should remain in force for 5 years from date, and as long thereafter as oil or gas should be produced; that, however, if no well should be commenced on the land on or before April 30, 1920, the lease should terminate, unless the lessees, on or before that date, should pay or tender to the lessors the sums of $1 per acre per year which should operate as a rental and cover the privilege of deferring commencement of a well for 12 months from said last-named date, and that in like manner, and upon like payments or tenders, the commencement of a well might be deferred for like periods. The privilege of assigning the estate of either party to the lease, in whole or in part, was expressly allowed, and the lessors warranted and agreed to defend the title to the lease.

The lease also contained the following provisions:

"And it is understood and agreed that the consideration first recited herein, the down payment, covers not only the privileges granted to the date when first rental is payable as aforesaid, but also the lessee's option of extending that period as aforesaid, and any and all other rights conferred, but in this connection it is agreed that the completion of a well which produces oil or gas in paying quantities, shall hold only the 640 acres surrounding it, with such well as near the center thereof as may be practicable, without further cash rental, but as to all other acreage, the provisions herein for cash rental, as in this paragraph contained, remains in force.

"Should the first well drilled on the above-described land be a dry hole, then, and in that event, if a second well is not commenced on said land within 12 months from the expiration of the last rental period, which rental has been paid, this lease shall terminate as to both parties, unless the lessee on or before the expiration of said 12 months shall resume payment of rental in the same amount and in the same manner as hereinbefore provided.

"And it is agreed that upon the resumption of the payment of rentals, as above provided, that the last preceding paragraph hereof, governing the payment of rentals and the effect thereof, shall continue in force just as though there had been no interruption in the rental payments."

Defendants in error, before April 30, 1920, entered upon said leased premises and had begun and were drilling wells thereon, and prior to this date plaintiffs in error demanded of defendants in error the payment of $22,000, claiming if same were not paid by April 30, 1920, they would forfeit the lease. Defendant in error, Simon, testified that their purpose in taking the lease from the Dales was more or less a speculation; that they intended to sell or assign the lease, in whole or in part, as they could for a profit; that they also contemplated drilling; that they did not make much progress selling leases until they decided to drill three wells, and that they sold acreage based upon their contract that they would drill and complete these wells; that they sold as much as 6,000 or 8,000 acres to 25 or 30 parties, some of which sales were to large oil companies; that they had contracts where part was paid when they began drilling and the balance to be paid when wells were completed; that they had contracts with others to drill wells; that a few days prior to April 30, 1920, he heard the Dales claimed that he and Brown owed them $22,000 rentals April 30, 1920; that he and his attorney had a conference with J. E. and J. T. Dale; that he told them that wells were being drilled, and under the lease he and Brown would not owe rentals on April 30, 1920; that J. E. Dale told him that he had to pay the rentals anyway, and that they would forfeit the lease if he did not pay; that he explained to Dale that should a forfeit be declared he and Brown would be subjected to lawsuits by those with whom they had contracts; that they would be prevented thereby from selling acreage and that their business would be injured; that his demand was unlawful and unjust, but if he insisted they could not afford not to pay, for their loss would be many times $22,000; that he offered to put $22,000 in Dale's bank, and suggested that they have a suit to determine whether same was payable; that Dale told him that he would notify him at Fort Worth of his final decision; that the next day he received from Dale the following telegram:

"My brother concurs in my position that unless rental for next twelve months paid on date specified in lease that a forfeiture must be declared we are unwilling to make any agreement at time of payment which might contemplate litigation of any kind as we consider this a voluntary payment believing ourselves justified in this position we can now only advise you that unless rental paid forfeiture will be declared and we will not entertain any other proposition if you desire payment may be made at Fort Worth National Bank to our credit which we will consider as payment made in Henrietta.    J. E. Dale."

He also testified:

"I received that message on the date specified there, that afternoon. After receiving that message I finally made the payment of the $22,000. I made it to the Fort Worth National Bank as requested to the credit of Dale Brothers, the three Dales, I think. I paid $22,-000. I made the payment because I knew I would be subject to a damage suit by the Lucky Jack Oil Company because they would not be permitted, in that event, to carry out the contract that I had made with them to complete that well. I knew that I would be subject to a damage suit by Call & Sines for the entire amount of money that I had agreed to pay them for the drilling of those wells. I knew that I would be subject to suits by the companies that had paid me in part for the leases that I had sold to the individuals because my obligation to them was to actually complete the three wells.

"I feared and believed that I would never be able to sell any of the large oil companies a lease based upon my agreement to drill an oil well because of the fact that I had fallen down in the present undertaking. I had had conversations with quite a few of the representatives of the oil companies, these companies that we sold to, and other oil companies with whom I had come in contact with reference to buying acreage from persons who agreed to drill wells. I want to state that I feared and believed that my general business integrity and reputation would be impaired, if not actually ruined, if I failed to carry out these contracts that I had obligated myself to carry out."

Plaintiffs in error answered by general denial, and that the contract as written was not the contract made between the parties therein named, due to a mutual mistake of said parties in drafting and signing same; that the contract between the parties was that the defendants in error pay the down payment of $110,000 and the further payments of $22,000 per year on or about April 30, 1920, 1921, 1922, and 1923 respectively, and that as to any section of said lands on which defendants in error might make a bona fide test in an effort to produce oil, and conclude after such test that such section was not oil bearing, upon their releasing back to plaintiffs in error, relinquishing all rights therein, plaintiffs in error would release defendants in error from further payments of $1 per year per acre on such sections, and that should oil and gas be found and produced in paying quantities anywhere on said land, then as to 640 acres of such land in which such producing well was as near the center as practicable, the defendants in error should be released from paying $1 per acre per year as to all future payments after such production; and that no producing wells were drilled, nor sections released back. They also in their answer set up a cross-bill against defendants in error for $22,000 alleged to be due April 30, 1921, and prayed for a reformation of the written lease contract and recovery of $22,000 under same when reformed.

The evidence shows that after the contract was signed by Dan Brown and J. T. Dale and by J. E. Dale, for himself and J. B. Dale, at Henrietta, same was taken to Fort Worth where it was signed by U. M. Simon, and then J. E. Dale and Brown took it to Dallas where J. B. Dale signed it in person and where it was delivered.

The case was tried before a jury on special issues, and the jury found:

"(1) Prior to the execution of the lease contract it was, in substance, verbally agreed between J. E. Dale and Dan Brown that the Dales should lease the land in question for a period of 5 years for $5 per acre for the first year, and $1 per acre per annum unconditionally for the next 4 years, with the qualification that a producing well or a dry hole should re-

lease 640 acres on which it was located from future rentals.

"(2) In respect to the matter inquired about in question No. 1, through mutual mistake of J. E. Dale and Dan Brown, a different term was written into the contract of date the 29th day of May, 1919.

"(3) At the time they signed the typewritten lease, both Dan Brown and the Dales believed that its terms, as actually written, meant and required unconditionally the payment of $1 per acre as rents for the next 4 years after the first year, with the qualification that a producing well or dry hole would release 640 acres surrounding it from rentals.

"(4) At the time they signed the typewritten lease, Dan Brown and U. M. Simon, as lessees, and the Dales, as lessors, did not believe that its terms, as actually written, meant and required unconditionally the payment of $1 per acre per annum as rent for the next 4 years after the first year, with the qualification that a producing well or dry hole would release 640 acres surrounding it from future rentals.

"(5) The payment by plaintiffs to defendants of $22,000 on or about April 29, 1920, was made under duress."

In response to supplemental issue A the jury found:

"J. T. Dale and J. B. Dale, at the time they fixed their signatures to the lease introduced in evidence, dated May 29, 1919, did so with the mistaken belief that said lease contained the unconditional term that the lessees were to pay for the land after the expiration of the first year at the rate of $1 per acre per annum, with the qualification that a producing well or dry hole should release the 640 acres on which it was from future rentals."

On this verdict the court entered judgment for defendants in error for $22,000, with interest and cost, and against plaintiffs in error on their cross-action.

On appeal the Court of Civil Appeals reformed the judgment of the trial court, to the effect that Simon recover $11,000 with interest from plaintiffs in error; that Brown take nothing and as to his suit plaintiffs in error go hence without day; and that plaintiffs in error take nothing by their cross-action. In reaching this conclusion the court held that the evidence was sufficient to sustain the verdict that the payment was made under duress, but that the judgment rendered by the trial court is in conflict with the verdict in that "the answers of the jury to questions 1, 2, 3, and supplement A established beyond dispute that the writing, because of mutual mistake, did not evidence the real contract between (defendant in error) appellee, Dan Brown, on the one side and the three Dales on the other, and as to these parties the contract was as contended by (plaintiffs in error) appellees"; that plaintiffs in error "would be entitled to a reformation of the contract as against Brown if it were not for the fact that there was no mistake upon Simon's part, and a reformation as against Brown cannot be made with-

out at the same time reforming as against Simon," for the reason that their interests are indivisible and it is impossible to reform as to one without adversely affecting the interest of the other and that the trial court properly denied plaintiffs in error the reformation sought; and that the conflict between the judgment and the verdict arises from the fact that Dan Brown, who is equally interested with Simon, was allowed a recovery for one-half of the $22,000. 248 S. W. 703.

[1] It is here insisted that there is no evidence raising the issue that payment was made under duress, and for this reason it was not within the province of the jury to say that the payment by defendants in error to plaintiffs in error was so made. There can be no duress unless there is a threat to do some act which the party threatening has no legal right to do. Such threat must be of such character as to destroy the free agency of the party to whom it is directed. It must overcome his will and cause him to do that which he would not otherwise do, and which he was not legally bound to do. The restraint caused by such threat must be imminent. It must be such that the person to whom it is directed has no present means of protection. Ward v. Scarborough (Tex. Com. App.) 236 S. W. 437; Landa v. Obert, 78 Tex. 33, 14 S. W. 297.

[2] Where a demand made is wrongful or unlawful, and it is necessary for the party making such demand to resort to the courts to enforce same, there is no duress, for the one upon whom demand is made has adequate means of protection, and there is no imminent restraint. Phœnix Land Co. v. Exall (Tex. Civ. App.) 159 S. W. 474; Shuck v. Interstate Building & Loan Association, 63 S. C. 134, 41 S. E. 28. But where the party making such demand has, or is supposed to have, the power to injure the business or property interests of the one upon whom such demand is made, without resort to the courts to enforce the demand, and threatens to do an act which would cause such injury, and which he has no right to do, and thereby induces a compliance with his demand, against the will of such party through fear of injury to his business or property interests, such threats amount to duress, if it appears that the party making such demand and threat ought not in good conscience to retain the benefit received by reason thereof. Guetzkow Bros. v. Breese, 96 Wis. 591, 72 N. W. 45, 65 Am. St. Rep. 83; Prickett v. Madison County, 14 Ill. App. 454; Chicago v. Sperbeck, 69 Ill. App. 562; Joannin v. Ogilvie, 49 Minn. 564, 52 N. W. 217, 16 L. R. A. 376, 32 Am. St. Rep. 581.

[3] Here the evidence shows that the Dales, plaintiffs in error, had leased to Simon and Brown, defendants in error, their 22,000 acres of land for the term of 5 years under a contract providing that should an oil well be commenced thereon on or prior to April 30, 1920, no rental would be required, but if not, a rental of $22,000 would be required on that date in order to extend the lease for 12 months. Under this lease Simon and Brown were engaged in selling acreage to others, and making contracts for the drilling of wells. They expected to make a profit by such sales and contracts, which they had a right to do. Wells had been commenced on the land and no rentals were due or would become due on April 30, 1920. The Dales, without any legal right to do so, insisted that $22,000 be paid them as rental, and declared that if this sum was not paid they would declare the lease forfeited—Simon acting for himself, and Brown protested. There is evidence authorizing the jury to find that, if a forfeiture were declared by the Dales, the defendants in error would be prevented from making further sales of acreage and their business injured, and that such declaration would cast a cloud upon their title under the lease. In order to declare a forfeiture it was not necessary for the Dales to resort to the courts. Simon insisted that he and Brown be allowed to place the $22,000 in Dales' bank and that suit be instituted to determine whether same should be paid. The Dales refused this offer. They possessed the power to injure the business and property interests of Simon and Brown by a mere declaration of forfeiture of the lease. Through fear of this injury Simon and Brown, under protest, made the payment.

Simon and Brown made this payment, each paying $11,000. At the time the contract was executed Simon understood it to represent in every particular respect the agreement of all the parties thereto. The fact that the Dales were mistaken as to its terms could not affect Simon in any of his rights under it. Having secured this payment from Simon by reason of this threat the Dales should not be allowed, in good conscience, to retain it.

[4] However, as to Brown, the facts are different. He understood the contract to be as contended by the Dales at the time he executed it. He understood when the contract was made that under its terms he was liable for the payment of the $11,000 paid by him. He also knew that the Dales had this understanding of its terms. Regardless as to whether the contract itself could be reformed it cannot be said that the demand as to him was wrongful. The payment was made by him according to the terms of the contract that he made with the Dales, and for this reason it should not be held that the Dales in good conscience ought not to retain it. To deny Brown recovery does not effect adversely the interest of Simon. Brown, as a plaintiff, suing the Dales to recover back his part of this payment, is placed in a different

attitude than he is as a joint defendant with Simon resisting a recovery under the written contract in an action by the Dales. His demand is in the nature of an equitable proceeding. The maxims of equity require that the one seeking equity must also offer to do equity, and that he must come with clean hands.

In Pomeroy's Equity Jurisprudence (4th Ed.) par. 397, where the maxim, "He who comes into equity must come with clean hands," is under discussion, is found this language:

"It says that whenever a party, who, as actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him in limine; the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy."

In the following paragraph it is said:

"Whatever may be the strictly accurate theory concerning the nature of equitable interference, the principle was established from the earliest days, that while the court of chancery could interpose and compel a defendant to comply with the dictates of conscience and good faith with regard to matters outside of the strict rules of the law, or even in contradiction to those rules, while it could act upon the conscience of a defendant and force him to do right and justice, it would never thus interfere on behalf of a plaintiff whose own conduct in connection with the same matter or transaction had been unconscientious or unjust, or marked by a want of good faith, or had violated any of the principles of equity and righteous dealing which it is the purpose of the jurisdiction to sustain. While a court of equity endeavors to promote and enforce justice, good faith, uprightness, fairness, and conscientiousness on the part of the parties who occupy a defensive position in judicial controversies, it no less stringently demands the same from the litigant parties who come before it as plaintiffs or actors in such controversies. This fundamental principle is expressed in the maxim, He who comes into a court of equity must come with clean hands; and although not the source of any distinctive doctrines, it furnishes a most important and even universal rule affecting the entire administration of equity jurisprudence as a system of remedies and remedial rights."

Applying these principles we have concluded there was no duress as to the payment by Brown and that he should be denied a recovery.

[5] We think the Court of Civil Appeals correctly held that under the written contract the interests of Simon and Brown are indivisible, and that it is not possible to reform the contract as to Brown without adversely affecting the interest of Simon. There being no mutual mistake, as alleged by plaintiff in error, the contract must stand as it is written. As this contract did not provide for rentals as contended by plaintiffs in error in their cross-action, they are not entitled to recover thereon against either Simon or Brown. Brown's rights, under this contract, are identical with those of Simon.

Under the pleadings and proof, the controlling issues were (a) whether the payment was made under duress, and (b) whether, by mutual mistake, the contract as written failed to express the real consideration for the lease.

On the first issue the verdict of the jury was in favor of Simon, but against Brown, and the judgment of the trial court was in conflict with the verdict on special issues 1, 2, 3, and supplement A in allowing Brown to recover on the issue of duress. On the second issue the answer of the jury to special issue No. 4, above mentioned, is controlling and the answers to the other issues are immaterial.

We therefore recommend that the judgment of the Court of Civil Appeals be affirmed.

CURETON, C. J. The judgment recommended in the report of the Commission of Appeals is adopted and will be entered as the judgment of the Supreme Court.