Wayne T. NANCE, II, et al., Appellants,

v.

RESOLUTION TRUST CORPORATION, as Receiver of Alamo Savings Association of Texas, and as Conservator for Alamo Federal Savings Association of Texas, Appellee.

No. 04–88–00580–CV.

Court of Appeals of Texas, San Antonio.

April 18, 1990.

Rehearing Denied July 11, 1990.

**326**

Jonathan Yedor, San Antonio, for appellants.

John E. Clark, Sawtelle, Goode, Davidson & Troilo, San Antonio, for appellee.

Before REEVES, PEEPLES and CARR, JJ.

## OPINION

PEEPLES, Justice.

This appeal arises from a lender liability lawsuit filed by appellant Nance against Alamo Savings Association of Texas and Alsave Corporation. Appellee Resolution Trust Corporation is the receiver of Alamo Savings Association of Texas, and conservator for Alamo Federal Savings Association of Texas. Nance alleged that Alamo breached its contract with him by failing to fund a loan for the construction of improvements to real property owned by Tezel Cluster, Ltd. Nance was the general partner of Tezel Cluster, Ltd; Alsave Corp., Alamo's wholly owned subsidiary, was the limited partner. A jury found that Alamo breached the contract, that Nance suffered damages in the amount of $993,000, and that Nance did not waive his right to complain of Alamo's breach of contract. Alamo filed a motion for judgment non obstante veredicto, which the court granted. The court set aside the jury verdict and rendered judgment for Alamo on its counterclaim in the amount of $954,566.65 —the deficiency balance on the loan at issue—plus interest, attorney's fees, and costs of court.

Nance presents nine points of error. Points one, two and three attack the granting of the judgment n.o.v. on the ground that there is legally sufficient evidence to support the jury's findings of breach of contract and damages. In point four, Nance urges that it was error to grant Alamo judgment on the note because the jury's answer to question one (breach of contract) established a defense to the counterclaim. Point five asserts that the trial court erred in failing to allow Nance to file a trial amendment in support of the jury verdict. Points six and seven assign as error the court's refusal to submit jury questions on breach of the covenant of good faith and fair dealing and economic coercion. In points eight and nine, Nance urges that his liability on the note was limited to 50% of the deficiency balance as a matter of law or, alternatively, that the trial court erred in failing to submit a jury question inquiring whether his individual guaranty was limited to 50% of the deficiency balance. We affirm in part and reverse and render in part.

## I. FACTUAL BACKGROUND.

Tezel Cluster, Ltd. was formed in the fall of 1983 for the purpose of building a 67-unit townhouse development in northwest Bexar County. Nance was the general contractor on the project as well as the general partner of the limited partnership. Alamo agreed to loan Tezel $3.65 million to acquire the land and build the improvements. Alamo's wholly owned subsidiary, Alsave Corp. was given a 50% profit interest in the project. The loan was evidenced by a construction loan agreement and a promissory note, both signed by Nance as general partner of Tezel. Nance also signed an individual guaranty of payment

and performance, which limited his liability under the guaranty to 50% of the indebtedness.

Section 4.02 of the construction loan agreement required Alamo to retain 10% of each advance to Nance:

Except as may otherwise be provided in the Disbursement Schedule, for each advance made to Borrower [Nance] hereunder Lender [Alamo] shall retain a sum equal to ten percent (10%) thereof (or a greater percentage, if required by any Legal Requirement) so that, until a period of thirty (30) days after completion of the Improvements (or such longer period if required by any Legal Requirement or if, during such longer period, a lien or claim could lawfully be filed against the Mortgage Property by anyone performing work or services, or furnishing materials, equipment or goods, during the construction of the Improvements). Lender shall have in its possession a fund equal to ten percent (10%) of the total cost of the Improvements.

The agreement defined "Improvements" as encompassing the entire 67–unit cluster housing complex. The disbursement schedule, attached to and made a part of the construction loan agreement, provided as follows:

II. Upon satisfaction of the foregoing requirements, Loan Proceeds in the amount shown in the final construction budget for "hard costs" shall be disbursed as follows:

(a) Upon request of Borrower [Nance] and not more frequently than monthly, Lender [Alamo] shall make disbursements to Borrower for the cost of work completed on the Improvements as itemized in the Request for Advance (in the form required by Lender) and in the amount by which the invoices, vouchers, statements, affidavits, payroll records and/or other documents approved by Lender, submitted therewith, together with the invoices, vouchers, statements, affidavits, payroll records and/or other documents, previously submitted to and approved by Lender, substantiate total costs on the Improvements to justify such an advance, when such documents are delivered to Lender, together with (a) a written request for disbursement on such form as shall be provided by or approved by Lender which form may require certification of work completed on the Improvements by the Architect, and (b) if required by Lender, an Affidavit of Borrower or the Contractor either (i) stating that any affidavit delivered under Section 4 of the Loan Agreement above is still true and correct as of the date of the new request or (ii) giving all of the information required under Section 4 of the Loan Agreement, but as of the date of the new request. All costs, fees and expenses shall be based upon the Exhibit "B–2" Schedule of Values submitted to and approved by Lender to which there shall be no amendment or modification without Lender's written consent.

(b) If any of the costs insured as shown in the disbursement request documents submitted above are subject to retention and therefore not disbursed to Borrower under Paragraph II(a) above, such sums shall be disbursed to Borrower when the conditions of Paragraph 4.02 of the Loan Agreement have been fully complied with.

Before construction began, a portion of the land was sold to a third party and the scope of the project was decreased from 67 to 45 units. A new budget was drawn reflecting the change, but the loan documents were not modified. Construction began early in 1985 and the project proceeded smoothly for the first few months. Beginning in June 1985, disputes arose concerning the 10% retainage and cutting of certain line item draw requests. As a result of these disputes some subcontractors were not paid and eventually quit the project. Construction stopped in September 1985 and, despite subsequent negotiations, was not resumed. Alamo foreclosed on the property and sold it, leaving a deficiency balance on the note of $954,566.65 at the time of trial.

## II. BREACH OF CONTRACT.

In points one and two, Nance contends that judgment n.o.v. was improper because there was sufficient evidence to support the jury's answer to question number one that Alamo breached the contract. Concerning breach of contract, Nance pleaded in his sixth amended petition as follows:

Alternatively, plaintiff would show that ALAMO contractually agreed to loan him the full amount of money necessary to acquire, build, and construct the project; and, that he would only be required to invest his own personal funds to complete construction only if he were to exceed the approved construction budget. Plaintiff complied with all of the loan contract terms, was not in default, but was forced into default when Defendant breached the loan agreement by [1] arbitrarily reducing the amount it would make available to Plaintiff in loan funds and by [2] wrongfully refusing to fund proper draw requests during the period June, 1985 through September, 1985.

To sustain the trial court's granting of the motion for judgment n.o.v., we must determine that there is no evidence to support the jury's findings. *Navarette v. Temple Indep. School Dist.*, 706 S.W.2d 308, 309 (Tex.1986); *Trenholm v. Ratcliff,* 646 S.W.2d 927, 931 (Tex.1983); *Williams v. Bennett,* 610 S.W.2d 144, 145 (Tex.1980). We must view the record in the light most favorable to those findings, considering only the evidence and inferences that support them and rejecting evidence and inferences to the contrary. *Navarette,* 706 S.W.2d at 309; *Williams,* 610 S.W.2d at 145.

The question posed in the first issue to the jury was "Do you find that ALAMO SAVINGS ASSOCIATION OF TEXAS breached its agreement to loan Tezel Cluster, Ltd., the funds to construct the Silver Creek Villas pursuant to the loan agreement between the parties?" The jury answered "Yes." We must determine whether there is more than a scintilla of competent evidence to support this answer. *Navarette,* 706 S.W.2d at 309.

In support of the jury's breach-of-contract finding, Nance points to two distinct allegations against Alamo: (1) that it improperly held 10% retainage and tried to recoup retainage previously paid to Nance by mistake; and (2) that it improperly reduced certain line item requests and did not pay the amounts that Nance was entitled to. To support the jury's finding of breach of contract, there must be more than a scintilla of competent evidence showing that Alamo's actions were not authorized by the loan agreement. Stated conversely, there must be some evidence that Nance's claims to the 10% retainage and the line item requests were justified by the agreement.

### A. Retainage.

Section 4.02 of the loan agreement clearly gave Alamo the right to withhold 10% retainage of each advance to Nance until 30 days after the project was completed. Nance produced evidence that the loan officer (Mr. Ross) who handled this project during the first few months of construction had a policy of waiving retainage on national suppliers and holding retainage for only 30 days following the completion of each subcontractor's job rather than 30 days following completion of the entire project. This loan officer testified that he followed this policy for the first few months, but he admitted this assertion was not supported by the documentary evidence. That evidence shows that at the time he left Alamo, the retainage withheld was exactly 10% of the amounts paid, in accordance with the contract. In any event, the evidence concerning the loan officer's policy, whether or not that policy was ever implemented, did not alter or modify the contract's retainage provisions.

Similarly, Nance produced evidence that after June 1, 1985, Alamo's attitude toward him, and its policy on retainage, changed. He attributed this change to the fluctuating economic climate in South Texas and to Alamo's alleged loss of faith in the project. Again, this evidence has no bearing on the retainage rights and responsibilities of the parties *under the*

*contract.* Despite assertions of policies, agreements, or understandings between Nance and certain loan officers, there is no evidence that the contract was ever altered or modified. While Nance argues that Alamo waived the retainage provision, the jury was not asked whether the retainage provision was waived or modified and Nance did not request jury questions to submit this theory. Consequently that theory has been waived. TEX.R.CIV.P. 272, 274. Nance's contention at oral argument that waiver [1] was established as a matter of law is not borne out by the record and is not urged by point of error in this court. The jury was expressly asked whether Alamo breached its agreement "to loan Tezel the funds to complete the project." There is no evidence that Alamo withheld more than 10% on any line item or that it withheld funds longer than the *contract* allowed. Because there is no evidence of breach of contract regarding retainage, the verdict cannot be sustained on this theory. We must therefore determine whether the jury's finding of breach of contract is supported on the theory that Alamo improperly cut line-item requests.

### B. Line-item requests.

■ Nance produced evidence that certain line-item requests in its draw applications for June, July, August, and September were either cut or not funded at all. Nance's former construction superintendent testified that Alamo disputed the percentage of work completed on these items, but that he had accompanied Alamo's representative to the site and showed him that the materials claimed were actually on site and the labor claimed had been performed. At trial, Alamo still disputed that the percentage of work claimed had been completed,[2] but we must reject this contrary evidence and accept the above-cited testimony as some evidence of Nance's entitlement to be paid as requested, which constitutes

some evidence that Alamo breached its agreement to pay the draw requests. Because there is some evidence of breach, the trial court erred in disregarding the jury's answer to question number one. Point of error two is sustained.

### III. DAMAGES.

In point of error three, Nance contends that it was error to grant the motion for judgment n.o.v. because there was sufficient evidence to support the jury's finding of damages in the amount of $993,000. Again, we must view the record in the light most favorable to this finding to determine whether there is more than a scintilla of evidence to support it. *Navarette,* 706 S.W.2d at 309.

■ The award of damages appears to represent approximately the amount of the deficiency balance on the note ($950,000) plus one-half of Nance's claimed out-of-pocket expenses ($43,000). Nance's former comptroller testified that Nance spent $86,000 out-of-pocket to keep the project going during disputes with Alamo. Nance himself testified that he spent $85,000. Despite Alamo's assertion that Nance failed to produce cancelled checks, specify to whom the money was paid, or identify the bank account from which the money was drawn, under the no-evidence standard of review this testimony constitutes some evidence to support $86,000 of the jury's finding on damages.

■ Concerning recovery of the amount of the deficiency balance, Alamo contends that this can only be supported by evidence that if the project had been completed, Nance would have broken even. This is a form of "lost profits" recovery.

■ It is apparent from the pleadings, the evidence, and the briefs that Nance recovered damages under the following

---

1. "Waiver is an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *Sun Exploration & Prod. Co. v. Benton,* 728 S.W.2d 35, 37 (Tex. 1987).

2. On some line items Alamo claimed that it did not fund the requests because they were not properly documented. But even if Alamo properly refused payment on these items, the failure to pay for the items involved in the "percentage complete" dispute still supports Nance's claim of breach of contract.

theory: if Alamo had funded the loan properly, he would have been able to complete the project and he would have sold the units at a profit, which would have enabled him to pay the $950,000 deficiency he owed to Alamo. Concerning damages under his breach of contract count, Nance pleaded, "The damages set forth in paragraph 2 above, form Plaintiff's basis for its damage claim under this theory of recovery [breach of contract]." Paragraph 2 of his live pleading sought damages as follows:

> Plaintiff believes, and upon such belief, alleges that had ALAMO not changed its manner in servicing the loan, he would have completed the project on time and would have sold the available units within a period of time sufficient to enable him to repay all monies borrowed without loss to himself or ALAMO.

> Plaintiff's damages are the full sums owed to ALAMO as the result of their foreclosing on the Limited Partnership after forcing Plaintiff into default, as well as the sum of approximately $85,000.00, representing Plaintiff's cash contribution toward construction resulting from ALAMO's pressure tactics outlined hereinabove. Hereinafter these sums will be referred to as Plaintiff's "damages".

Nance's brief in this court also says that the damages were based on the theory that the project could have been completed and sold without loss. Alamo concedes that this was Nance's theory of recovery but argues that there is no evidence of lost profits.[3]

■ We agree with Alamo that the evidence is legally insufficient to support the finding of lost profits. Damages for lost profits must be established with "reasonable certainty." *White v. Southwestern Bell Tel. Co.*, 651 S.W.2d 260, 262 (Tex. 1983); *International Harvester Co. v. Kesey*, 507 S.W.2d 195, 197 (Tex.1974); *Pace Corp. v. Jackson*, 155 Tex. 179, 284 S.W.2d 340, 347 (1955) ("reasonable degree of certainty"); *Southwest Battery Corp. v. Owen*, 131 Tex. 423, 115 S.W.2d 1097, 1098 (1938) ("reasonable degree of certainty and exactness").

■ When a business is new or unestablished, as the Tezel project was, the law requires strict proof of facts and data. *See Atomic Fuel Extraction Corp. v. Slick's Estate*, 386 S.W.2d 180, 188–89 (Tex.Civ. App.—San Antonio 1964), *writ ref'd n.r.e. per curiam*, 403 S.W.2d 784 (Tex.1965); *Barbier v. Barry*, 345 S.W.2d 557, 563 (Tex.Civ.App.—Dallas 1961, no writ).

3. In his reply brief, Nance argues that the damages are recoverable as "reliance damages" and not as lost profits. In fact he states that lost profits was only one of several damages theories available to him and that he failed to pursue it.

As we read Nance's pleading regarding damages, which is quoted in the text, he did not plead the reliance theory of damages that he urges in his reply brief. We therefore cannot sustain the judgment on this basis. *See* TEX.R. CIV.P. 301 (judgment shall conform to the pleadings).

In any event, we do not agree that the damages awarded in this case can be justified as reliance damages. The case cited by Nance in his reply brief, *Mistletoe Express Serv. v. Locke*, 762 S.W.2d 637 (Tex.App.—Texarkana 1988, no writ), says that reliance damages are awarded for "expenditures" made in reliance on actions of the breaching party. When the non-breaching party makes expenditures in reliance on a contract, said the court, it can recoup such *expenditures. Id.* at 638–39.

As examples of reliance damages—in contrast to expectation damages or loss of bargain—one *treatise mentions* a supplier's "expenditures for

labor and materials and other costs of preparation and part performance" and a purchaser's "spending money or making commitments for advertising, acquiring premises and equipment, hiring employees, and the like." E.A. FARNSWORTH, CONTRACTS § 12.16, at 888–89 (1982).

In *Mistletoe Express*, the injured party (Locke) had borrowed money and bought two vehicles to go into business in reliance on a contract with Mistletoe Express, the breaching party, under which Locke would do pickups and deliveries. After Mistletoe Express breached that contract, Locke mitigated his damages and sold the two vehicles at a loss. The court permitted him to recover the amount he still owed to the lender. That is a different matter from allowing recovery by Nance for the deficiency on the loan itself when Alamo's breach was failure to fully fund the loan itself. Clearly, Nance's liability for the deficiency on the note cannot qualify as an expenditure that is recoverable as reliance damages. To hold otherwise would enable any nonbreaching party to a loan contract to wipe out the entire deficiency as a "reliance" expense without proof that the underlying project would have been successful.

"While mathematical precision is not required to establish the extent or amount of one's damages, one must bring forward the best evidence of the damage of which the situation admits, and there must be some basis for reasonable inferences." *Gulf Coast Inv. Corp. v. Rothman*, 506 S.W.2d 856, 858 (Tex.1974). There must be proof of facts, figures, and data. *Turner v. PV Int'l Corp.*, 765 S.W.2d 455, 465–66 (Tex. App.—Dallas 1988), *writ denied per curiam on other grounds*, 778 S.W.2d 865 (Tex.1989); *Village Square, Ltd. v. Barton*, 660 S.W.2d 556, 560 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.).

Several of the cases cited above illustrate these principles. In *International Harvester v. Kesey*, 507 S.W.2d at 196–98, for example, the supreme court reversed a judgment granting damages for lost profits pertaining to crops. Concerning plaintiff's cotton crop, the court said there was no proof of the probable yield, the value of cotton per pound or per bale, or the probable expenses of growing the cotton. Concerning plaintiff's grain crop, the court noted the lack of proof of the kind of grain that would have been planted, the estimated yield, or the number of acres. Because of this failure of proof, the supreme court reversed the judgment for lost profits.

By contrast, in *Pace Corp. v. Jackson*, 284 S.W.2d at 348–50, the court affirmed a judgment for three different items of lost profits because there was proof of details. First, concerning damage to plaintiff's vending machine business, there was proof of the number of cigarette cartons sold, the added cost to the plaintiff as a result of defendant's breach, and length of time that the business had been injured. In addition, plaintiff recovered damages for the expected increase in his business because he proved the number of additional vending machines he could have put into operation, the amount of business the territory would support, and the expected yield. Finally, concerning damages to his wholesale business, plaintiff was allowed to recover because he proved the amount of his overhead, his existing orders, and the added cost resulting from defendant's breach. Upholding the jury verdict for lost profits,

the court stressed that the record contained the above-stated proof.

*Davis v. Small Business Inv. Co.*, 535 S.W.2d 740 (Tex.Civ.App.—Texarkana 1976, writ ref'd n.r.e.), also illustrates the kind of proof that is required. There the court affirmed an instructed verdict denying lost profits. The court said, "There was no evidence tending to show that the company could have ever made a profit. There was no evidence of contracts or sales which could have been anticipated, the cost of doing business, or the estimated profits, if any, which could be expected from any sales which might be made." *Id.* at 743. *Davis* is especially persuasive authority because it involved a suit by "a relatively new business which had never earned a profit" for failure to fund a loan.

■ We find no evidence in the record to support the finding of damages in the amount of the deficiency. Nance did testify that he thought the project could have been sold at no loss. He also testified without objection that a reputable real estate agent had met with Alamo on his behalf after the disputes arose and construction had halted. The agent submitted a "marketing plan," concerning which Nance testified, "They thought they could break even on the project." There was testimony from Nance's construction superintendent about the cost to complete the project, but nothing about how the profit would be made. None of this testimony meets the standards set forth above.

■ Nance cites *Mead v. Johnson Group, Inc.*, 615 S.W.2d 685 (Tex.1981), and *Investors, Inc. v. Hadley*, 738 S.W.2d 737 (Tex.App.—Austin 1987, writ denied), but neither case deals with the standard of proof for lost profits and neither purports to alter the longstanding rules set forth above. Nance also stresses the no-evidence standard of review, but that standard simply pertains to the way an appellate court must assess evidence; it does not alter the substantive law set forth in the authorities cited above regarding what there must be legally sufficient evidence of. The lost profits cases concerning the

kind of proof required and the legal sufficiency cases concerning appellate review have existed side-by-side in Texas for decades. We are not aware of any decisions that have held that the latter line of cases constitutes an exception to the former; if that were the law, one could raise a fact issue on lost profits solely on the strength of statements such as "If the defendant had not been negligent, I would have made a profit in the amount of $X$," or "Had it not been for the defendant's breach, I would have drilled a producing oil well and reaped profits of $Y$."

We conclude that the trial court correctly granted Alamo's motion for judgment n.o.v. on the ground that there was no evidence to support the award of damages.

## IV. DENIAL OF LEAVE TO FILE TRIAL AMENDMENT.

In points four and five, Nance contends that the jury's finding of breach of contract established a defense to Alamo's counterclaim on the note and that the trial court erred in refusing to grant him a post-verdict trial amendment to plead such breach as an affirmative defense. The trial court has great discretion in deciding whether to permit a trial amendment. *Hardin v. Hardin*, 597 S.W.2d 347, 349–50 (Tex.1980); *Fry v. Guillote*, 577 S.W.2d 346, 347–48 (Tex.Civ.App.—Houston [14th Dist.] 1979, writ ref'd n.r.e.).

We conclude that the trial court's denial of leave to file the trial amendment was within its discretion. Nance filed an amended answer to Alamo's counterclaim approximately two weeks before the trial commenced. At this time breach of contract was clearly available as a defense. Nance's amended answer to the counterclaim asserted the defenses of limitation of recovery, equitable estoppel, and economic duress, but not breach of contract. Nance did not seek a trial amendment to add this defense until one month after the jury verdict was returned. Nance has not shown an abuse of discretion. Because the affirmative defense of breach of contract was not pleaded, the jury's answer to question number one does not establish a defense to

Alamo's counterclaim. Points of error four and five are overruled.

## V. DUTY OF GOOD FAITH AND FAIR DEALING.

In point of error six, Nance contends that the court erred in refusing to submit his requested special issue inquiring whether Alamo breached its duty of good faith and fair dealing in its business dealings with him. Nance has not cited any Texas authority, nor have we found any, recognizing such a duty of good faith and fair dealing in the circumstances of this case. Indeed, this implied duty is not favored by the courts of this state, except in certain circumstances. In *English v. Fischer*, 660 S.W.2d 521 (Tex.1983), the supreme court stated that the concept of an implied covenant of good faith and fair dealing is

contrary to our well-reasoned and long-established adversary system which has served us ably in Texas for almost 150 years. Our system permits parties who have a dispute over a contract to present their case to an impartial tribunal for a determination of the agreement as made by the parties and embodied in the contract itself. To adopt the laudatory sounding theory of "good faith and fair dealing" would place a party under the onerous threat of treble damages should he seek to compel his adversary to perform according to the contract terms as agreed upon by the parties. The novel concept advocated by the courts below would abolish our system of government according to settled rules of law and let each case be decided upon what might seem "fair and in good faith," by each fact finder. This we are unwilling to do.

*English*, 660 S.W.2d at 522.

Justice Spears, concurring in *English*, noted that Texas courts have read a duty of good faith and fair dealing into many types of contractually-based transactions. *See id.* at 524. None of these situations is at issue here. The "common thread" among such cases is "a special relationship between the parties to the contract" that [1] "arises from the element of trust neces-

sary to accomplish the goals of the undertaking, or [2] has been imposed by the courts because of an imbalance of bargaining power." *Id.; see also Lovell v. Western Nat'l Life Ins. Co.,* 754 S.W.2d 298, 302 (Tex.App.—Amarillo 1988, writ denied) (no duty of good faith and fair dealing unless created by express language in contract or special relationship between parties). There is no express language in the contract here at issue creating this duty. Further, the lender-borrower relationship here involved is not a "special relationship" that would justify reading such a duty into the contract. *Cf. Arnold v. Nat'l County Mut. Fire Ins. Co.,* 725 S.W.2d 165 (Tex. 1987) (insurers have duty to deal fairly and in good faith with insureds). The relationship between Nance and Alamo was not a fiduciary relationship, nor is there evidence of a long-standing personal or social relationship between the parties, or an imbalance of bargaining power. *See Lovell,* 754 S.W.2d at 303. Finally, the transaction here at issue is not governed by the business and commerce code, and section 1.203 of that code does not apply. For all of these reasons, we decline to extend the doctrine of good faith and fair dealing to the facts of the case at bar. Because there is no duty of good faith and fair dealing applicable to this case, the court did not err in refusing Nance's requested special issue.

■ In any event, if the court did err in failing to submit the requested issue, that error was harmless. Nance sought the same damages under this cause of action as he sought under his action for breach of contract. We have already held that he is entitled to recover $86,000 as damages for his out-of-pocket expenses, but there is no evidence to support the remainder of his claimed damages. Nance is not entitled to a second opportunity to prove his damages. Thus, nothing would be gained by a remand to consider additional causes of action seeking the same damages. Point of error six is overruled.

## VI. ECONOMIC COERCION.

■ In point of error seven, Nance asserts that the court erred in refusing to submit his requested special issue inquiring whether Alamo's failure to fund his draw requests constituted economic coercion or duress. Nance specifically contends that Alamo's use of its contractual right to withhold 10% retainage was exercised in such a way as to coerce him into using his own money on the project. In order to sustain a cause of action for economic duress, there must be evidence that

[1] there is a threat to do some act which the party threatening has no legal right to do. [2] Such threat must be of such character as to destroy the free agency of the party to whom it is directed. It must overcome his will and cause him to do that which he would not otherwise do, and which he was not legally bound to do. [3] The restraint caused by such threat must be imminent. [4] It must be such that the person to whom it is directed has no present means of protection.

*State Nat'l Bank v. Farah Mfg. Co.,* 678 S.W.2d 661, 684 (Tex.App.—El Paso 1984, writ dism'd by agr.), quoting *Dale v. Simon,* 267 S.W. 467, 470 (Tex.Comm'n App. 1924, judgmt adopted).

■ The evidence is wholly insufficient to support submission of this cause of action to the jury. There is no evidence that Nance's will was overcome by any threat made by Alamo. Indeed, there is no evidence of any threat at all, and the only action of which Nance complains—the withholding of 10% retainage—was specifically authorized by the terms of the contract. Thus, Alamo cannot be said to have threatened or taken action that it had no legal right to take.

*Farah,* upon which Nance relies, is distinguishable on this point. That case involved acceleration of sums due under a note. The contract there in dispute provided that an event of default occurred if the management of the plaintiff company changed in a manner deemed adverse to the interests of any two lending banks. *Farah,* 678 S.W.2d at 667. The defendant threatened invocation of this clause to prevent the plaintiff company from electing a certain person to be its CEO. The court

held that the wrongful use of this *threat* constituted economic coercion. The court noted, however, that if the bank had refrained from issuing threats to control the election of the CEO, and if the person to whom the bank objected was elected, it would have been "the legitimate option of the lenders to determine whether or not it should be viewed as a default." *Id.* at 686. In the present case, there is no evidence that Alamo threatened use of the retainage provision to force Nance into doing something that he was not bound to do, or that he would not otherwise have done. Rather, the evidence shows only that Alamo asserted its legitimate retainage rights under the contract. This does not constitute economic coercion.

■■■ Also, as noted above in regard to point of error six, Nance sought the same damages under his action for economic coercion as he sought for breach of contract. Again, we have held that he is entitled to recover $86,000 as damages for his out-of-pocket expenses, but there is no evidence to support the remainder of his claimed damages. Nothing would be gained by a remand to consider additional causes of action seeking these same damages. Point of error seven is overruled.

## VII. EXTENT OF NANCE'S LIABILITY.

■■■ In points of error eight and nine, Nance contends that his liability on the note is limited to 50% of the deficiency as a matter of law, or alternatively, that the trial court erred in failing to submit a jury question on the issue of limited liability. Nance's claim is based on the fact that he signed a guaranty which limited his liability to 50% of the amount due under the note. The guaranty, however, specifically states that the obligations of the guarantor (Nance, individually) are independent of the obligations of the borrower (Tezel Cluster, Ltd.). Nance signed the note as general partner of Tezel Cluster, Ltd. As a general partner, he is liable for all debts and obligations of the partnership. TEX.REV. CIV.STAT.ANN. art. 6132a–1, § 4.03(b) (Vernon Supp.1989); art. 6132b, § 15 (Ver-

non 1970). Nance is liable for 100% of the deficiency balance as general partner of the borrower, independent of his 50% liability as guarantor. Points eight and nine are overruled.

The judgment n.o.v. is affirmed insofar as it denies damages in excess of $86,000; insofar as it denies damages of $86,000, it is reversed and judgment is rendered for appellant in the amount of $86,000 on the jury's verdict, which is ordered offset against Alamo's recovery for the deficiency. In all other respects, the judgment is affirmed.

## ON APPELLANTS' MOTION FOR REHEARING

Nance has filed a motion for rehearing urging, among other things, that this court erred in failing to award him attorney's fees in the amount stipulated in the trial court, and in holding that the trial court did not err in denying leave to file his post-verdict trial amendment.

Nance pleaded his entitlement to attorney's fees in the court below, and the amount of those fees was stipulated. In the prayer for relief in his original brief to this court, he requested that we grant him the attorney's fees stipulated below. Because we held in our original opinion that Nance is entitled to recovery for breach of contract, we also hold that he is entitled to attorney's fees in the stipulated amount. Our judgment is reformed to so provide.

■■■ With regard to the post-verdict trial amendment, Nance contends that *Greenhalgh v. Service Lloyds Ins. Co.*, 787 S.W.2d 938 (1990), requires us to hold that the court's refusal to permit the trial amendment was an abuse of discretion. Nance's reliance on this case is misplaced. The specific holding of the court in *Greenhalgh* was that "a trial court must allow a trial amendment *that increases the amount of damages sought in the pleadings to that found by the jury* unless the opposing party presents evidence of prejudice or surprise." *Id.* (emphasis added). The court went on to state

a trial court has no discretion to refuse an amendment unless: 1) the opposing party presents evidence of surprise or prejudice, ...; *or* 2) *the amendment asserts a new cause of action or defense, and thus is prejudicial on its face, and the opposing party objects to the amendment.*

*Id.* at 939 (emphasis added). The type of amendment sought in *Greenhalgh,* increasing the amount of damages pleaded, falls within the first category because it does not assert a new cause of action or defense. Thus, the trial court has no discretion unless the opposing party shows surprise or prejudice.

Nance's trial amendment did not seek to increase the amount of damages, but sought to add an affirmative defense that had not been previously pleaded. It therefore falls within the second *Greenhalgh* category. Nance argues in his motion for rehearing that Alamo failed to present evidence of surprise or prejudice, but he does not address the fact that his amendment asserted a new defense, was prejudicial on its face, and relieved Alamo of the burden of showing surprise. *See id.* at 940 n. 3. The trial court had the discretion to refuse the amendment and, for the reasons set out in our original opinion, that discretion was not abused.

The other issues raised by Nance in his motion for rehearing have been addressed in our original opinion.

The motion for rehearing is granted in part and denied in part. The judgment of this court is reformed to order that Nance recover attorney's fees in the amount stipulated in the trial court.